**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| WILLIAM ACKER, MICHAEL AMENDOLA, AIDEN ANKLI, LYRA BUTLER-DENMAN, TENARA CALEM, TYLER CATANELLA, GRAHAM COOK, RYANN COOPER, ELIZABETH FEINSCHREIBER, FRANCIS GORMLEY, MIRANDA KRAMER, ARIANNA OLIVIERI, DEREK SMITH, and EVA SOLANO, individually and on behalf of all others similarly situated, | Case No. **CLASS ACTION COMPLAINT** **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| THE UNIVERSITY OF THE ARTS, | |
| Defendant. | |

This class action complaint is brought by Plaintiffs William Acker, Michael Amendola, Aiden Ankli, Lyra Butler-Denman, Tenara Calem, Tyler Catanella, Graham Cook, Ryann Cooper, Elizabeth Feinschreiber, Francis Gormley, Miranda Kramer, Arianna Olivieri, Derek Smith, and Eva Solano ("Plaintiffs"), individually and on behalf of all others similarly situated ("Class"), against Defendant The University of the Arts ("Defendant" or the "University"). The allegations set forth below are based on personal knowledge as to Plaintiffs' own acts and on investigation conducted by counsel as to all other allegations.

## PARTIES

1.      Plaintiff William Acker is a citizen and resident of Pennsylvania.

2.      Plaintiff Michael Amendola is a citizen and resident of Pennsylvania.

3.      Plaintiff Aiden Ankli is a citizen and resident of Pennsylvania.

4.      Plaintiff Lyra Butler-Denman is a citizen and resident of Pennsylvania.

5.      Plaintiff Tenara Calem is a citizen and resident of Pennsylvania.

6.      Plaintiff Tyler Catanella is a citizen and resident of Pennsylvania.

7.      Plaintiff Graham Cook is a citizen and resident of Pennsylvania.

8.      Plaintiff Ryann Cooper is a citizen of Maryland and resident of Pennsylvania.

9.      Plaintiff Elizabeth Feinschreiber is a citizen of Massachusetts and resident of Pennsylvania.

10.     Plaintiff Francis Gormley is a citizen and resident of Pennsylvania.

11.     Plaintiff Miranda Kramer is a citizen and resident of Pennsylvania.

12.     Plaintiff Arianna Olivieri is a citizen of Italy and a resident of Pennsylvania.

13.     Plaintiff Derek Smith is a citizen of Rhode Island and resident of Pennsylvania.

14.     Plaintiff Eva Solano is a citizen and resident of Pennsylvania.

15.     Defendant The University of the Arts is a private university organized as a Pennsylvania nonprofit corporation with its principal place of business in Philadelphia, Pennsylvania. Defendant is a citizen of Pennsylvania.

## JURISDICTION AND VENUE

16.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are Class members who have diverse citizenship from Defendant, and (4) there are more than 100 Class members.

17.     This Court has general personal jurisdiction over Defendant because Defendant is a citizen of this state and has its principal place of business in this state.

2

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) & (2) because Defendant is a resident of this district and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## FACTUAL ALLEGATIONS

### I.  The University of the Arts

19.     The University of the Arts is an arts university in Philadelphia, Pennsylvania offering undergraduate and graduate degrees in art, dance, design, film, music, and theater.[1]

20.     The University has about 1,300 students, 77 full-time faculty, and hundreds of full-time and part-time employees in total.[2]

21.     Full-time tuition to the University is $54,010.

22.     As of May 31, 2024, the University was accepting applications for admissions and allowing students to enroll for the upcoming semesters.

23.     As of May 31, 2024, the University was accredited by the Middle States Commission on Higher Education ("MSCHE") and the National Association of Schools of Music ("NASM").[3]

### II.  Accreditation Standards

24.     MSCHE has specific standards that institutions must meet to be accredited. Those standards include[4]:

> [H]onesty and truthfulness in public relations announcements, advertisements, recruiting and admissions materials and practices, as well as in internal communications;

> . . .

---

[1] https://www.uarts.edu/about/quick-facts
[2] *Id.*
[3] *Id.*
[4] https://www.msche.org/standards/fourteenth-edition/

compliance with all applicable government laws and regulations and Commission policies and procedures, including but not limited to:

    a.  required information for students and the public;

    b.  representation of accreditation status;

    c.  full disclosure of information on institution-wide assessments, graduation, retention, certification and licensure or licensing board pass rates;

    d.  institution's compliance with the Commission's Requirements of Affiliation;

    e.  verification of student identity in distance and correspondence education;

    f.  substantive changes affecting institutional mission, goals, programs, operations, sites, and other material issues which must be disclosed in a timely and accurate fashion;

. . .

clearly documented and communicated planning and improvement processes that provide for inclusive constituent participation;

. . .

a financial planning and budgeting process that is aligned with the institution's mission and goals, evidence-based, and clearly linked to the institution's and units' strategic plans/objectives;

. . .

documented financial resources, funding base, and plans for financial development, including those from any related entities adequate to support its educational purposes and programs and to ensure financial stability;

. . .

a record of responsible fiscal management, including preparing a multi-year budget and an annual independent audit confirming financial viability and proper internal financial controls, with evidence of corrective measures taken to address any material findings cited in the audit or an accompanying management letter;

4

. . .

> strategies to measure and assess the adequacy and efficient utilization of institutional resources required to support the institution's mission and goals; and

> . . .

> periodic assessment of the effectiveness of planning, resource allocation, institutional renewal processes, and availability of resources.[5]

25.     MSCHE also requires that institutions submit for approval a "teach-out" plan whenever the institution is at risk of closing or if requested by the MSCHE.[6]

26.     Teach-out plans "ensure the equitable treatment of students upon the occurrence of certain events or circumstances."[7]

27.     A teach-out plan provides students with options to transfer to another institution in case their current institution closes.[8]

28.     MSCHE requires institutions "to provide early notification of a potential circumstance requiring a teach-out plan."[9]

29.     Pennsylvania law also requires that State Board of Private Licensed Schools be notified 30 days in advance if a school intends to close. 22 Pa. Code § 73.95(a).

### III.   Announcement of the Closure

30.     According to MSCHE's public record of its review actions involving the University, on May 30, 2024, MSCHE stated the following:

> Staff acted on behalf of the Commission to request a supplemental information report, due May 30, 2024, by 12:00 p.m. ET, providing an update on the status of the institution. To require that the

---

[5] *Id.*
[6] https://msche.box.com/shared/static/zc0xbcz32x4xv7adrtv75mftpyulojfr.pdf
[7] *Id.*
[8] *Id.*
[9] *Id.*

institution complete and submit for approval, by June 7, 2024, a comprehensive, implementable teach-out plan and signed teach-out agreements with appropriate teach-out partner institutions (Teach-Out Plans and Agreements Policy and Procedures). In accordance with Commission policy and federal regulations, the teach-out plan must provide for the equitable treatment of students to complete their education or transfer to another institution. To note the Commission may reject the teach-out plan and require resubmission if all of the required information is not provided. To remind the institution and the governing body of its obligation to inform the Commission immediately about any and all significant developments relevant to this action and to make freely available to the Commission accurate, fair, and complete information on all aspects of the institution and its operations to all constituents.[10]

31.    According to MSCHE's review of the University, on May 31, 2024, MSCHE stated

the following:

To acknowledge receipt of the institution's notification on Wednesday, May 29, 2024, regarding the status of the institution and unplanned, imminent closure. To note that the institution failed to inform the Commission of closure in a timely manner or to properly plan for closure with prior approval through substantive change. To require immediate notification to the Commission verifying the date of closure of the institution by email to actions@msche.org. To take an immediate adverse action to withdraw accreditation from University of the Arts effective June 1, 2024. To note that the Commission has determined that an immediate adverse action is necessary because the institution has not complied with the Commission's procedures, requests for written reports, teach-out plan, or other information, specifically (1) the institution is not in compliance with Standard I (Mission and Goals), Standard II (Ethics and Integrity), Standard III (Design and Delivery of the Student Learning Experience), Standard IV (Support of the Student Experience), Standard V (Educational Effectiveness Assessment), Standard VI (Planning, Resources, and Institutional Improvement), Standard VII (Governance, Leadership, and Administration), and Requirement of Affiliation 2; (2) the institution has failed to ensure all communications with constituents, regulatory agencies, and the Commission comply with the Communication in the Accreditation Process Policy and Procedures; (3) the institution has failed to obtain prior approval for closure through the Substantive Change Policy and Procedures; (4) the institution has not met the requirements of the Commission's Public

---

[10] https://www.msche.org/institution/0549/

Disclosures Policy and Procedures; (5) the institution has failed to demonstrate that it can provide a quality student learning experience (Accreditation Actions Policy and Procedures); (6) the institution has failed to demonstrate the capacity to make required improvements (Accreditation Actions Policy and Procedures); (7) the institution has failed to demonstrate that it can sustain itself in the short or long term (Accreditation Actions Policy and Procedures); (8) the institution has failed to demonstrate that it has documented financial resources, funding base, and plans for financial development (Standard VI); and (9) the institution is in imminent danger of closing (Accreditation Actions Policy and Procedures). This decision is based on the institution's current non-compliance and accreditation activities, including the institution's notification of closure dated May 29, 2024; the supplemental information report submitted after the 12:00 p.m., May 30, 2024, deadline, and subsequent communications and correspondence of record between the institution and the Commission. These institutional reports and responses have failed to document that the institution has achieved and can sustain ongoing compliance with the Commission's standards for accreditation, requirements of affiliation, policies and procedures, and applicable federal regulatory requirements, including Standard I (Mission and Goals), Standard II (Ethics and Integrity), Standard III (Design and Delivery of the Student Learning Experience), Standard IV (Support of the Student Experience), Standard V (Educational Effectiveness Assessment), Standard VI (Planning, Resources, and Institutional Improvement), Standard VII (Governance, Leadership, and Administration), Requirement of Affiliation 2, Accreditation Actions Policy and Procedures, Communication in the Accreditation Process Policy and Procedures, Public Disclosures Policy and Procedures, Substantive Change Policy and Procedures, and Teach-Out Plans and Agreements Policy and Procedures. To note that any adverse action is subject to appeal in accordance with the Commission's Appeals from Adverse Actions Procedures. To direct the institution to immediately (1) notify all constituents of the immediate withdrawal of accreditation; (2) notify the University of the Arts community, including all governing board members, students, faculty, staff, and others with significant roles, of the status of the institution; (3) provide accurate information regarding the institution's accreditation status with MSCHE on its website and wherever accreditation is referenced on the institution's web pages, publications, announcements, and in all other appropriate places and venues; (4) complete and issue transcripts at no cost to all students wishing to transfer to another institution; (5) enter into signed teach-out agreements; (6) identify a repository for student and institutional records so that students and alumni will be able to obtain accurate

and complete transcripts in the future; and (7) report accurate, fair, and complete information on all aspects of the institution and its operations in a manner that allows the Commission to carry out its accrediting responsibilities (Accreditation Actions Policy and Procedures, Communication in the Accreditation Process Policy and Procedures, Public Disclosures Policy and Procedures, Substantive Change Policy and Procedures, and Teach-Out Plans and Agreements Policy and Procedures). To remind the institution that it must complete and submit for approval, by June 7, 2024, a comprehensive, implementable teach-out plan and signed teach-out agreements with appropriate teach-out partner institutions (Teach-Out Plans and Agreements Policy and Procedures). The teach-out plan must include evidence that the institution immediately made required notifications and disclosures. To note that if the institution is not operational with students actively enrolled in its degree granting programs in violation of Requirement of Affiliation 2, the Commission will consider the institution closed and terminate any pending appeal. To note that if the Commission determines that the institution has violated any other Commission policies and procedures, standards for accreditation, requirements of affiliation, or applicable federal regulatory requirements, the Commission will take additional action. To note all final adverse actions are subject to the arbitration requirements in the Commission's Arbitration of Disputes Concerning Final Adverse Actions Procedures and federal regulation 34 CFR §602.20(e). To note that accreditation will cease on June 1, 2024.[11]

32.     MSCHE's statements reveal that the University had failed to meet MSCHE standards for accreditation and that the University made the abrupt decision to close—and informed MSCHE of this decision—on May 29, 2024.[12]

33.     On Friday, May 31, 2024, at approximately 6:00 PM, local news media announced that the University was closing permanently on June 7, 2024.[13]

34.     The University attributed the abrupt closure to an "urgent crisis" but offered no further detail and no explanation of how this crisis was unforeseeable or not apparent before.[14]

---

[11] *Id.*
[12] *Id.*
[13] https://www.uarts.edu/closing; https://www.inquirer.com/education/uarts-abruptly-closing-june-loss-accreditation-20240531.html
[14] https://www.uarts.edu/closing

35.     Rather, the consequences of the University's poor financial position were foreseeable to University leadership, and the University's abrupt announcement and lack of explanation evidence that the University had simply waited for this inevitable outcome until the last minute while failing to provide reasonable notice to students and faculty.

36.     The announcement was made publicly on local news media before any announcement was sent directly to students and faculty.

37.     Before May 31, there had been no prior warning or suggestion by University leadership that a closure was imminent.

38.     Students and faculty were given no prior warning of the decision to close, which was apparently made in a short amount of time by the most senior leadership of the University without input from students, faculty, or other stakeholders.

39.     On June 1, 2024, the MSCHE withdrew the University's accreditation.[15]

40.     On June 3, 2024, Defendant canceled town halls with students, faculty, and staff a mere 10 minutes before they were scheduled to start, simply reiterating that they have no reasonable explanation for the abrupt closure of the University.[16]

41.     On June 4, 2024, University president Kerry Walk resigned.[17]

42.     Defendant's employees were terminated on or before June 7, 2024, pursuant to the closure.

43.     Some employees were constructively terminated on May 31, 2024, the date of the closure, because they were no longer assigned or scheduled to work.

---

[15] https://www.uarts.edu/about/accreditation
[16] https://6abc.com/post/university-arts-philadelphia-set-hold-town-hall-meetings/14904122/
[17] https://www.inquirer.com/education/uarts-philadelphia-president-kerry-walk-resignation-20240604.html

44.     The closure of the University leaves students with great uncertainty about the future of their education and careers as well as severe financial hardship from having spent effort, time, and money to attend the University and to live in the Philadelphia area while attending the University and having to continue paying for living expenses while not earning their degree.

45.     The closure of the University will cause students, faculty, and staff to lose health insurance provided by or obtained through the University.

## IV.  Plaintiffs' Experience

### A.   William Acker

46.     Plaintiff William Acker is a citizen and resident of Pennsylvania.

47.     Up until the date of the University's closure, Plaintiff had been a student at the University seeking a Master of Fine Arts in Devised Performance.

48.     Plaintiff began their program in August 2022 and was set to finish the program in December 2024.

49.     Plaintiff had one semester left to complete the program when the University was closed without notice on May 31, 2024.

50.     Plaintiff and their family moved to Philadelphia in 2022 to attend the University.

51.     Plaintiff attended the University because of its affiliation with the Pig Iron School, a theatre company that offers a unique Master of Fine Arts in Devised Performance.

52.     An important consideration in choosing the University was that the University was accredited by a reputable accreditation agency.

53.     Plaintiff knew that accreditation meant that the University was viable, reliable, stable, and would meet accreditation standards.

54.     Plaintiff reasonably relied on the University's accreditation status when choosing to attend the University.

55.     Had the University not been accredited, or lost its accreditation status, Plaintiff would not have enrolled in the University, or would have only paid substantially less in tuition.

56.     Plaintiff will now need to find another university to which they can transfer their credits and ultimately obtain their degree.

57.     The loss of the University's unique programs and offerings which attracted Plaintiff to the University further make transferring to another university and continuing Plaintiff's educational and career goals difficult.

58.     Plaintiff expended considerable effort, time, and money to attend the University.

59.     Plaintiff has lost valuable opportunities and must now refocus their effort, time, and money toward obtaining a degree from another university, which may have different degree requirements, take more time, and cost more money.

**B.  Michael Amendola**

60.     Plaintiff Michael Amendola is a citizen and resident of Pennsylvania.

61.     Up until the date of the University's closure, Plaintiff had been a student at the University seeking a Master of Fine Arts in Devised Performance.

62.     Plaintiff began their program in August 2022 and was set to finish the program in December 2024.

63.     Plaintiff had one semester left to complete the program when the University was closed without notice on May 31, 2024.

64.     Plaintiff moved to Philadelphia in 2022 to attend the University.

65.     Plaintiff attended the University because of its affiliation with the Pig Iron School, a theatre company that offers a unique Master of Fine Arts in Devised Performance.

66.     An important consideration in choosing the University was that the University was accredited by a reputable accreditation agency.

67.     Plaintiff knew that accreditation meant that the University was viable, reliable, stable, and would meet accreditation standards.

68.     Plaintiff reasonably relied on the University's accreditation status when choosing to attend the University.

69.     Had the University not been accredited, or lost its accreditation status, Plaintiff would not have enrolled in the University, or would have only paid substantially less in tuition.

70.     Plaintiff will now need to find another university to which they can transfer their credits and ultimately obtain their degree.

71.     The loss of the University's unique programs and offerings which attracted Plaintiff to the University further make transferring to another university and continuing Plaintiff's educational and career goals difficult.

72.     Plaintiff expended considerable effort, time, and money to attend the University.

73.     Plaintiff has lost valuable opportunities and must now refocus their effort, time, and money toward obtaining a degree from another university, which may have different degree requirements, take more time, and cost more money.

**C.  Aiden Ankli**

74.     Plaintiff Aiden Ankli is a citizen and resident of Pennsylvania.

75.     Up until the date of the University's closure, Plaintiff had been a student at the University seeking a Master of Fine Arts in Devised Performance.

76.     Plaintiff began their program in August 2022 and was set to finish the program in December 2024.

77.     Plaintiff had one semester left to complete the program when the University was closed without notice on May 31, 2024.

78.     Plaintiff moved to Philadelphia in 2022 to attend the University.

79.     Plaintiff attended the University because of its affiliation with the Pig Iron School, a theatre company that offers a unique Master of Fine Arts in Devised Performance.

80.     An important consideration in choosing the University was that the University was accredited by a reputable accreditation agency.

81.     Plaintiff knew that accreditation meant that the University was viable, reliable, stable, and would meet accreditation standards.

82.     Plaintiff reasonably relied on the University's accreditation status when choosing to attend the University.

83.     Had the University not been accredited, or lost its accreditation status, Plaintiff would not have enrolled in the University, or would have only paid substantially less in tuition.

84.     Plaintiff will now need to find another university to which they can transfer their credits and ultimately obtain their degree.

85.     The loss of the University's unique programs and offerings which attracted Plaintiff to the University further make transferring to another university and continuing Plaintiff's educational and career goals difficult.

86.     Plaintiff expended considerable effort, time, and money to attend the University.

87.     Plaintiff has lost valuable opportunities and must now refocus their effort, time, and money toward obtaining a degree from another university, which may have different degree requirements, take more time, and cost more money.

**D.  Lyra Butler-Denman**

88.     Plaintiff Lyra Butler-Denman is a citizen and resident of Pennsylvania.

89.     Up until the date of the University's closure, Plaintiff had been a student at the University seeking a Master of Fine Arts in Devised Performance.

90.     Plaintiff began their program in August 2022 and was set to finish the program in December 2024.

91.     Plaintiff had one semester left to complete the program when the University was closed without notice on May 31, 2024.

92.     Plaintiff moved to Philadelphia in 2022 to attend the University.

93.     Plaintiff attended the University because of its affiliation with the Pig Iron School, a theatre company that offers a unique Master of Fine Arts in Devised Performance.

94.     An important consideration in choosing the University was that the University was accredited by a reputable accreditation agency.

95.     Plaintiff knew that accreditation meant that the University was viable, reliable, stable, and would meet accreditation standards.

96.     Plaintiff reasonably relied on the University's accreditation status when choosing to attend the University.

97.     Had the University not been accredited, or lost its accreditation status, Plaintiff would not have enrolled in the University, or would have only paid substantially less in tuition.

98.     Plaintiff will now need to find another university to which they can transfer their credits and ultimately obtain their degree.

99.     The loss of the University's unique programs and offerings which attracted Plaintiff to the University further make transferring to another university and continuing Plaintiff's educational and career goals difficult.

100.    Plaintiff expended considerable effort, time, and money to attend the University.

101.    Plaintiff has lost valuable opportunities and must now refocus their effort, time, and money toward obtaining a degree from another university, which may have different degree requirements, take more time, and cost more money.

**E.   Tenara Calem**

102.    Plaintiff Tenara Calem is a citizen and resident of Pennsylvania.

103.    Up until the date of the University's closure, Plaintiff had been a student at the University seeking a Master of Fine Arts in Devised Performance.

104.    Plaintiff began their program in August 2022 and was set to finish the program in December 2024.

105.    Plaintiff had one semester left to complete the program when the University was closed without notice on May 31, 2024.

106.    Plaintiff considered other schools and degree programs, but ultimately chose University of the Arts because of its unique programs and offerings that aligned with Plaintiff's educational and career goals.

107.    Plaintiff attended the University because of its affiliation with the Pig Iron School, a theatre company that offers a unique Master of Fine Arts in Devised Performance.

108.     An important consideration in choosing the University was that the University was accredited by a reputable accreditation agency.

109.     Plaintiff knew that accreditation meant that the University was viable, reliable, stable, and would meet accreditation standards.

110.     Plaintiff reasonably relied on the University's accreditation status when choosing to attend the University.

111.     Had the University not been accredited, or lost its accreditation status, Plaintiff would not have enrolled in the University, or would have only paid substantially less in tuition.

112.     Plaintiff will now need to find another university to which they can transfer their credits and ultimately obtain their degree.

113.     The loss of the University's unique programs and offerings which attracted Plaintiff to the University further make transferring to another university and continuing Plaintiff's educational and career goals difficult.

114.     Plaintiff expended considerable effort, time, and money to attend the University.

115.     Plaintiff has lost valuable opportunities and must now refocus their effort, time, and money toward obtaining a degree from another university, which may have different degree requirements, take more time, and cost more money.

**F.  Tyler Catanella**

116.     Plaintiff Tyler Catanella is a citizen and resident of Pennsylvania.

117.     Up until the date of the University's closure, Plaintiff had been a student at the University seeking a Master of Fine Arts in Devised Performance.

118.     Plaintiff began their program in August 2022 and was set to finish the program in December 2024.

119.    Plaintiff had one semester left to complete the program when the University was closed without notice on May 31, 2024.

120.    Plaintiff moved to Philadelphia in 2022 to attend the University.

121.    Plaintiff considered other schools and degree programs, but ultimately chose University of the Arts because of its unique programs and offerings that aligned with Plaintiff's educational and career goals.

122.    Plaintiff attended the University to pursue a full-time teaching career, because of its affiliation with the Pig Iron School, a theatre company that offers a unique Master of Fine Arts in Devised Performance, and to be closer to their partner and family.

123.    An important consideration in choosing the University was that the University was accredited by a reputable accreditation agency.

124.    Plaintiff knew that accreditation meant that the University was viable, reliable, stable, and would meet accreditation standards.

125.    Plaintiff reasonably relied on the University's accreditation status when choosing to attend the University.

126.    Had the University not been accredited, or lost its accreditation status, Plaintiff would not have enrolled in the University, or would have only paid substantially less in tuition.

127.    Plaintiff will now need to find another university to which they can transfer their credits and ultimately obtain their degree.

128.    The loss of the University's unique programs and offerings which attracted Plaintiff to the University further make transferring to another university and continuing Plaintiff's educational and career goals difficult.

129.    Plaintiff expended considerable effort, time, and money to attend the University.

130.     Plaintiff has lost valuable opportunities and must now refocus their effort, time, and money toward obtaining a degree from another university, which may have different degree requirements, take more time, and cost more money.

**G.   Graham Cook**

131.     Plaintiff Graham Cook is a citizen and resident of Pennsylvania.

132.     Up until the date of the University's closure, Plaintiff had been a student at the University seeking a Master of Fine Arts in Devised Performance.

133.     Plaintiff began their program in August 2022 and was set to finish the program in December 2024.

134.     Plaintiff had one semester left to complete the program when the University was closed without notice on May 31, 2024.

135.     Plaintiff attended the University because of its affiliation with the Pig Iron School, a theatre company that offers a unique Master of Fine Arts in Devised Performance.

136.     An important consideration in choosing the University was that the University was accredited by a reputable accreditation agency.

137.     Plaintiff knew that accreditation meant that the University was viable, reliable, stable, and would meet accreditation standards.

138.     Plaintiff reasonably relied on the University's accreditation status when choosing to attend the University.

139.     Had the University not been accredited, or lost its accreditation status, Plaintiff would not have enrolled in the University, or would have only paid substantially less in tuition.

140.     Plaintiff will now need to find another university to which they can transfer their credits and ultimately obtain their degree.

141.    The loss of the University's unique programs and offerings which attracted Plaintiff to the University further make transferring to another university and continuing Plaintiff's educational and career goals difficult.

142.    Plaintiff expended considerable effort, time, and money to attend the University.

143.    Plaintiff has lost valuable opportunities and must now refocus their effort, time, and money toward obtaining a degree from another university, which may have different degree requirements, take more time, and cost more money.

**H.   Ryann Cooper**

144.    Plaintiff Ryann Cooper is a citizen of Maryland and resident of Pennsylvania.

145.    Up until the date of the University's closure, Plaintiff had been a student at the University seeking a Master of Fine Arts in Devised Performance.

146.    Plaintiff began their program in August 2022 and was set to finish the program in December 2024.

147.    Plaintiff had one semester left to complete the program when the University was closed without notice on May 31, 2024.

148.    Plaintiff considered other schools and degree programs, but ultimately chose University of the Arts because of its unique programs and offerings that aligned with Plaintiff's educational and career goals.

149.    Plaintiff attended the University because of its affiliation with the Pig Iron School, a theatre company that offers a unique Master of Fine Arts in Devised Performance.

150.    An important consideration in choosing the University was that the University was accredited by a reputable accreditation agency.

151.    Plaintiff knew that accreditation meant that the University was viable, reliable, stable, and would meet accreditation standards.

152.    Plaintiff reasonably relied on the University's accreditation status when choosing to attend the University.

153.    Had the University not been accredited, or lost its accreditation status, Plaintiff would not have enrolled in the University, or would have only paid substantially less in tuition.

154.    Plaintiff will now need to find another university to which they can transfer their credits and ultimately obtain their degree.

155.    The loss of the University's unique programs and offerings which attracted Plaintiff to the University further make transferring to another university and continuing Plaintiff's educational and career goals difficult.

156.    Plaintiff expended considerable effort, time, and money to attend the University.

157.    Plaintiff has lost valuable opportunities and must now refocus their effort, time, and money toward obtaining a degree from another university, which may have different degree requirements, take more time, and cost more money.

**I.  Elizabeth Feinschreiber**

158.    Plaintiff Elizabeth Feinschreiber is a citizen of Massachusetts and resident of Pennsylvania.

159.    Up until the date of the University's closure, Plaintiff had been a student at the University seeking a Master of Fine Arts in Devised Performance.

160.    Plaintiff began their program in August 2022 and was set to finish the program in December 2024.

161.    Plaintiff had one semester left to complete the program when the University was closed without notice on May 31, 2024.

162.    Plaintiff considered other schools and degree programs, but ultimately chose University of the Arts because of its unique programs and offerings that aligned with Plaintiff's educational and career goals.

163.    Plaintiff attended the University because of its affiliation with the Pig Iron School, a theatre company that offers a unique Master of Fine Arts in Devised Performance.

164.    An important consideration in choosing the University was that the University was accredited by a reputable accreditation agency.

165.    Plaintiff knew that accreditation meant that the University was viable, reliable, stable, and would meet accreditation standards.

166.    Plaintiff reasonably relied on the University's accreditation status when choosing to attend the University.

167.    Had the University not been accredited, or lost its accreditation status, Plaintiff would not have enrolled in the University, or would have only paid substantially less in tuition.

168.    Plaintiff will now need to find another university to which they can transfer their credits and ultimately obtain their degree.

169.    The loss of the University's unique programs and offerings which attracted Plaintiff to the University further make transferring to another university and continuing Plaintiff's educational and career goals difficult.

170.    Plaintiff expended considerable effort, time, and money to attend the University.

171.    Plaintiff has lost valuable opportunities and must now refocus their effort, time, and money toward obtaining a degree from another university, which may have different degree requirements, take more time, and cost more money.

**J.   Francis Gormley**

172.    Plaintiff Francis Gormley is a citizen and resident of Pennsylvania.

173.    Up until the date of the University's closure, Plaintiff had been a student at the University seeking a Master of Fine Arts in Devised Performance.

174.    Plaintiff began their program in August 2022 and was set to finish the program in December 2024.

175.    Plaintiff had one semester left to complete the program when the University was closed without notice on May 31, 2024.

176.    Plaintiff moved to Philadelphia in 2022 to attend the University.

177.    Plaintiff attended the University because of its affiliation with the Pig Iron School, a theatre company that offers a unique Master of Fine Arts in Devised Performance.

178.    An important consideration in choosing the University was that the University was accredited by a reputable accreditation agency.

179.    Plaintiff knew that accreditation meant that the University was viable, reliable, stable, and would meet accreditation standards.

180.    Plaintiff reasonably relied on the University's accreditation status when choosing to attend the University.

181.    Had the University not been accredited, or lost its accreditation status, Plaintiff would not have enrolled in the University, or would have only paid substantially less in tuition.

182.    Plaintiff will now need to find another university to which they can transfer their credits and ultimately obtain their degree.

183.    The loss of the University's unique programs and offerings which attracted Plaintiff to the University further make transferring to another university and continuing Plaintiff's educational and career goals difficult.

184.    Plaintiff expended considerable effort, time, and money to attend the University.

185.    Plaintiff has lost valuable opportunities and must now refocus their effort, time, and money toward obtaining a degree from another university, which may have different degree requirements, take more time, and cost more money.

**K.  Miranda Kramer**

186.    Plaintiff Miranda Kramer is a citizen and resident of Pennsylvania.

187.    Up until the date of the University's closure, Plaintiff had been a student at the University seeking a Master of Fine Arts in Devised Performance.

188.    Plaintiff began their program in August 2022 and was set to finish the program in December 2024.

189.    Plaintiff had one semester left to complete the program when the University was closed without notice on May 31, 2024.

190.    Plaintiff moved to Philadelphia in 2022 to attend the University.

191.    Plaintiff attended the University because of its affiliation with the Pig Iron School, a theatre company that offers a unique Master of Fine Arts in Devised Performance.

192.    An important consideration in choosing the University was that the University was accredited by a reputable accreditation agency.

193.    Plaintiff knew that accreditation meant that the University was viable, reliable, stable, and would meet accreditation standards.

194.    Plaintiff reasonably relied on the University's accreditation status when choosing to attend the University.

195.    Had the University not been accredited, or lost its accreditation status, Plaintiff would not have enrolled in the University, or would have only paid substantially less in tuition.

196.    Plaintiff will now need to find another university to which they can transfer their credits and ultimately obtain their degree.

197.    The loss of the University's unique programs and offerings which attracted Plaintiff to the University further make transferring to another university and continuing Plaintiff's educational and career goals difficult.

198.    Plaintiff expended considerable effort, time, and money to attend the University.

199.    Plaintiff has lost valuable opportunities and must now refocus their effort, time, and money toward obtaining a degree from another university, which may have different degree requirements, take more time, and cost more money.

**L.  Arianna Olivieri**

200.    Plaintiff Arianna Olivieri is a citizen of Italy and a resident of Pennsylvania.

201.    Up until the date of the University's closure, Plaintiff had been a student at the University seeking a Master of Arts in Museum Studies with a concentration in Audience Engagement.

202.    Plaintiff began their program in fall of 2023 and was set to finish the program in summer 2024.

203.     Plaintiff had one semester left to complete the program when the University was closed without notice on May 31, 2024.

204.     Plaintiff obtained an F-1 student visa and moved to Philadelphia to attend the University.

205.     Plaintiff considered other schools and degree programs, but ultimately chose University of the Arts because of its unique programs and offerings that aligned with Plaintiff's educational and career goals.

206.     Plaintiff attended the University because the unique museum studies program was well-regarded, required only a year to complete, and included coursework on diversity, equity, inclusion, and accessibility.

207.     An important consideration in choosing the University was that the University was accredited by a reputable accreditation agency.

208.     Plaintiff knew that accreditation meant that the University was viable, reliable, stable, and would meet accreditation standards.

209.     Plaintiff reasonably relied on the University's accreditation status when choosing to attend the University.

210.     Had the University not been accredited, or lost its accreditation status, Plaintiff would not have enrolled in the University, or would have only paid substantially less in tuition.

211.     Plaintiff will now need to find another university to which they can transfer their credits and ultimately obtain their degree.

212.     The loss of the University's unique programs and offerings which attracted Plaintiff to the University further make transferring to another university and continuing Plaintiff's educational and career goals difficult.

213.    Plaintiff expended considerable effort, time, and money to attend the University.

214.    Plaintiff has lost valuable opportunities and must now refocus their effort, time, and money toward obtaining a degree from another university, which may have different degree requirements, take more time, and cost more money.

**M.  Derek Smith**

215.    Plaintiff Derek Smith is a citizen of Rhode Island and resident of Pennsylvania.

216.    Up until the date of the University's closure, Plaintiff had been a student at the University seeking a Master of Fine Arts in Devised Performance.

217.    Plaintiff began their program in August 2022 and was set to finish the program in December 2024.

218.    Plaintiff had one semester left to complete the program when the University was closed without notice on May 31, 2024.

219.    Plaintiff considered other schools and degree programs, but ultimately chose University of the Arts because of its unique programs and offerings that aligned with Plaintiff's educational and career goals.

220.    Plaintiff attended the University because of its affiliation with the Pig Iron School, a theatre company that offers a unique Master of Fine Arts in Devised Performance.

221.    An important consideration in choosing the University was that the University was accredited by a reputable accreditation agency.

222.    Plaintiff knew that accreditation meant that the University was viable, reliable, stable, and would meet accreditation standards.

223.    Plaintiff reasonably relied on the University's accreditation status when choosing to attend the University.

26

224.   Had the University not been accredited, or lost its accreditation status, Plaintiff would not have enrolled in the University, or would have only paid substantially less in tuition.

225.   Plaintiff will now need to find another university to which they can transfer their credits and ultimately obtain their degree.

226.   The loss of the University's unique programs and offerings which attracted Plaintiff to the University further make transferring to another university and continuing Plaintiff's educational and career goals difficult.

227.   Plaintiff expended considerable effort, time, and money to attend the University.

228.   Plaintiff has lost valuable opportunities and must now refocus their effort, time, and money toward obtaining a degree from another university, which may have different degree requirements, take more time, and cost more money.

**N.   Eva Solano**

229.   Plaintiff Eva Solano is a citizen and resident of Pennsylvania.

230.   Up until the date of the University's closure, Plaintiff had been a student at the University seeking a Master of Arts in Museum Studies with a concentration in Museum Education.

231.   Plaintiff began their program in fall of 2023 and was set to finish the program in summer 2024.

232.   Plaintiff had one semester left to complete the program when the University was closed without notice on May 31, 2024.

233.   Plaintiff considered other schools and degree programs, but ultimately chose University of the Arts because of its unique programs and offerings that aligned with Plaintiff's educational and career goals.

234.    Plaintiff attended the University because the unique museum studies program was well-regarded and required only a year to complete.

235.    An important consideration in choosing the University was that the University was accredited by a reputable accreditation agency.

236.    Plaintiff knew that accreditation meant that the University was viable, reliable, stable, and would meet accreditation standards.

237.    Plaintiff reasonably relied on the University's accreditation status when choosing to attend the University.

238.    Had the University not been accredited, or lost its accreditation status, Plaintiff would not have enrolled in the University, or would have only paid substantially less in tuition.

239.    Plaintiff will now need to find another university to which they can transfer their credits and ultimately obtain their degree.

240.    The loss of the University's unique programs and offerings which attracted Plaintiff to the University further make transferring to another university and continuing Plaintiff's educational and career goals difficult.

241.    Plaintiff expended considerable effort, time, and money to attend the University.

242.    Plaintiff has lost valuable opportunities and must now refocus their effort, time, and money toward obtaining a degree from another university, which may have different degree requirements, take more time, and cost more money.

**V.   Plaintiffs and Class Members Have Been Injured**

243.    Plaintiffs and Class members entered into a contract with Defendant when they enrolled in the University.

244.     The parties' contract required that the University follow state regulations, remain accredited, and meet the standards of accreditation, including its ability to remain financially stable, promptly notify students of an impending closure, and provide students with a teach-out plan to continue their education at another university.

245.     Implied in the parties' contract is a covenant of good faith and fair dealing, which requires that Defendant execute its obligations under the contract with due care and consideration for the other parties to the contract.

246.     Implied in the parties' contract is an agreement to comply with all laws and regulations which are relevant to the purpose of the contract.

247.     Implied in the parties' contract is an agreement to do and perform whatever is necessary to accomplish the purpose of the contract and to refrain from doing anything that is injurious to another party's right to receive the fruits of the contract.

248.     Defendant's obligations under the contract, including to remain financially stable, promptly notify students of an impending closure, and provide students with a teach-out plan, were intended to benefit Plaintiffs and Class members, Plaintiffs and Class members reasonably relied on Defendant's ability to meet its obligations, and Defendant's obligations were material to Plaintiffs and Class members choice to enroll in the University.

249.     The University held itself out as a viable, reliable, stable university which could follow state regulations, remain accredited, and meet the standards of accreditation, including its ability to remain financially stable, promptly notify students of an impending closure, and provide students with a teach-out plan to continue their education at another university.

250.     Defendant knew that it was financially unstable and that it could not follow state regulations, remain accredited, and meet the standards of accreditation.

251.    Defendant intended that students rely on its misrepresentations and omissions when choosing to enroll in the University.

252.    The facts mispresented, concealed, and omitted by Defendant were material because a reasonable person would have considered them to be important in deciding whether to enroll in the University.

253.    Defendant knew or should have known that the facts mispresented, concealed, and omitted were material to Plaintiffs and Class members.

254.    Defendant had a duty to inform Plaintiffs and Class members that it was financially unstable and that it could not follow state regulations, remain accredited, and meet the standards of accreditation because Defendant had superior knowledge about such circumstances, and Plaintiffs and Class members could not reasonably have been expected to discover such circumstances through reasonable diligence before enrolling in the University.

255.    Plaintiffs and Class members reasonably relied on Defendant's misrepresentations and omissions when choosing to enroll in the University.

256.    Defendant induced Plaintiffs and Class members to enroll in the University with knowledge that it could not follow state regulations, remain accredited, and meet the standards of accreditation.

257.    Plaintiffs and Class members paid tuition to Defendant, declined employment and other opportunities, or declined enrollment at other institutions so that they could attend the University and obtain the benefits guaranteed under the contract.

258.    Defendant breached the parties' contract, including the covenant of good faith and fair dealing, when it failed to notify students, staff, its accrediting agency, or government regulators of its financial instability and impending closure.

259.    Defendant breached the parties' contract, including the covenant of good faith and fair dealing, when it failed to create a teach-out plan for enrolled students, despite knowledge of its financial instability and impending closure.

260.    Defendant breached the parties' contract, including the covenant of good faith and fair dealing, when it closed the University with no notice, leaving students with no plan to transfer credits or attend another university.

261.    Defendant's breach of the parties' contract directly injured Plaintiffs and Class members, who have spent considerable time and money seeking a degree from the University but now cannot continue their education at the University or transfer to another university within a reasonable time and for a reasonable cost.

262.    Plaintiffs and Class members paid tuition, turned down other opportunities, and provided Defendant with other benefits, but did not receive the promised benefits in return.

263.    Plaintiffs and Class members have not materially breached the contract, have complied with all obligations under the contract, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

264.    As a result of Defendant's unlawful conduct, Plaintiff and Class members are entitled to statutory, compensatory, incidental, consequential, and punitive damages and restitution, including, *inter alia*, (1) reimbursement of all tuition paid to the University during the time that it knew or should have known that could not comply with state law and meet its accreditation standards, (2) reimbursement of all payments made to the University for services not yet received, including tuition, meal plans, and housing, (3) reimbursement of all payments made in reliance on the University's misrepresentations, concealment, and omissions of material facts related to its legal compliance and accreditation status, including textbooks, school supplies,

moving expenses, living expenses, and student loan, (4) reimbursement of all payments made as a consequence of the University's closure, including university application fees and moving expenses, (5) such other and further relief as this Court may deem just, equitable, or proper.

## CLASS ALLEGATIONS

265.    This action is brought as a class action under Fed. R. Civ. P. 23.

266.    The Class is defined as follows:

> All students who were enrolled in The University of the Arts as of May 31, 2024.

267.    The Class definition may be modified based upon discovery and further investigation.

268.    *Numerosity*: The Class is so numerous that joinder of all members is impracticable. The Class may be ascertained through discovery of records from Defendant and third parties.

269.    *Commonality*: There are questions of law or fact common to the Class, including, without limitation, whether Defendant engaged in unlawful conduct that entitles Plaintiffs and Class members to relief.

270.    *Typicality*: Plaintiffs' claims are typical of the claims of Class members. Plaintiffs and Class members were injured and suffered damages in substantially the same manner, have the same claims against Defendant relating to the same course of conduct, and are entitled to relief under the same legal theories.

271.    *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the interests of the Class. Plaintiffs' counsel are experienced in the prosecution of complex class actions, including actions with issues, claims, and defenses similar to the present case.

272.     *Predominance and superiority*: Questions of law or fact common to the Class predominate over any questions affecting individual members because all claims arise out of the same unlawful conduct by Defendant and depend on the same determinations of law and fact. A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all Class members is impracticable and the amount at issue for each Class member would not justify the cost of litigating individual claims. Should individual Class members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court. There are no difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

273.     Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

274.     Defendant's unlawful conduct applies generally to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

275.     Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(2).

## CAUSES OF ACTION

### COUNT I
**BREACH OF CONTRACT**
**(on behalf of Plaintiffs and the Class)**

276.    All preceding paragraphs are incorporated by reference as though fully set forth herein.

277.    Plaintiffs and Class members entered into a contract with Defendant when they enrolled in the University.

278.    The parties' contract required that the University follow state regulations, remain accredited, and meet the standards of accreditation, including its ability to remain financially stable, promptly notify students of an impending closure, and provide students with a teach-out plan to continue their education at another university.

279.    Implied in the parties' contract is a covenant of good faith and fair dealing, which requires that Defendant execute its obligations under the contract with due care and consideration for the other parties to the contract.

280.    Implied in the parties' contract is an agreement to comply with all laws and regulations which are relevant to the purpose of the contract.

281.    Implied in the parties' contract is an agreement to do and perform whatever is necessary to accomplish the purpose of the contract and to refrain from doing anything that is injurious to another party's right to receive the fruits of the contract.

282.    Defendant's obligations under the contract, including to remain financially stable, promptly notify students of an impending closure, and provide students with a teach-out plan, were intended to benefit Plaintiffs and Class members, Plaintiffs and Class members reasonably relied on Defendant's ability to meet its obligations, and Defendant's obligations were material to Plaintiffs and Class members choice to enroll in the University.

283.     Plaintiffs and Class members paid tuition to Defendant, declined employment and other opportunities, or declined enrollment at other institutions so that they could attend the University and obtain the benefits guaranteed under the contract.

284.     Defendant breached the parties' contract, including the covenant of good faith and fair dealing, when it failed to notify students, staff, its accrediting agency, or government regulators of its financial instability and impending closure.

285.     Defendant breached the parties' contract, including the covenant of good faith and fair dealing, when it failed to create a teach-out plan for enrolled students, despite knowledge of its financial instability and impending closure.

286.     Defendant breached the parties' contract, including the covenant of good faith and fair dealing, when it closed the University with no notice, leaving students with no plan to transfer credits or attend another university.

287.     Defendant's breach of the parties' contract directly injured Plaintiffs and Class members, who have spent considerable time and money seeking a degree from the University but now cannot continue their education at the University or transfer to another university within a reasonable time and for a reasonable cost.

288.     Plaintiffs and Class members paid tuition, turned down other opportunities, and provided Defendant with other benefits, but did not receive the promised benefits in return.

289.     Plaintiffs and Class members have not materially breached the contract, have complied with all obligations under the contract, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

290.    Defendant's conduct was reckless, wanton, malicious, intentional, and with gross disregard for the rights of Plaintiffs and Class members, thereby entitling Plaintiffs and Class members to punitive damages.

291.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been injured and sustained damages.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(on behalf of Plaintiffs and the Class)**

292.    All preceding paragraphs are incorporated by reference as though fully set forth herein.

293.    Plaintiffs and Class members entered into an implied contract with Defendant when they enrolled in the University.

294.    The parties' contract required that the University follow state regulations, remain accredited, and meet the standards of accreditation, including its ability to remain financially stable, promptly notify students of an impending closure, and provide students with a teach-out plan to continue their education at another university.

295.    Implied in the parties' contract is a covenant of good faith and fair dealing, which requires that Defendant execute its obligations under the contract with due care and consideration for the other parties to the contract.

296.    Implied in the parties' contract is an agreement to comply with all laws and regulations which are relevant to the purpose of the contract.

297.    Implied in the parties' contract is an agreement to do and perform whatever is necessary to accomplish the purpose of the contract and to refrain from doing anything that is injurious to another party's right to receive the fruits of the contract.

298.    The contract was implied by the parties conduct, including Defendant's representations that the University would follow state regulations, remain accredited, and meet the standards of accreditation, including its ability to remain financially stable, promptly notify students of an impending closure, and provide students with a teach-out plan to continue their education at another university and Plaintiff's enrollment and payment of tuition in reliance of Defendant's representations.

299.    Plaintiff's reliance on Defendant's representations was reasonable and foreseeable because a reasonable person would rely on a university's representations concerning its viability and compliance when choosing to enroll and pay tuition.

300.    Defendant's obligations under the contract, including to remain financially stable, promptly notify students of an impending closure, and provide students with a teach-out plan, were intended to benefit Plaintiffs and Class members, Plaintiffs and Class members reasonably relied on Defendant's ability to meet its obligations, and Defendant's obligations were material to Plaintiffs and Class members choice to enroll in the University.

301.    Plaintiffs and Class members paid tuition to Defendant, declined employment and other opportunities, or declined enrollment at other institutions so that they could attend the University and obtain the benefits guaranteed under the contract.

302.    Defendant breached the parties' contract, including the covenant of good faith and fair dealing, when it failed to notify students, staff, its accrediting agency, or government regulators of its financial instability and impending closure.

303.    Defendant breached the parties' contract, including the covenant of good faith and fair dealing, when it failed to create a teach-out plan for enrolled students, despite knowledge of its financial instability and impending closure.

304.     Defendant breached the parties' contract, including the covenant of good faith and fair dealing, when it closed the University with no notice, leaving students with no plan to transfer credits or attend another university.

305.     Defendant's breach of the parties' contract directly injured Plaintiffs and Class members, who have spent considerable time and money seeking a degree from the University but now cannot continue their education at the University or transfer to another university within a reasonable time and for a reasonable cost.

306.     Plaintiffs and Class members paid tuition, turned down other opportunities, and provided Defendant with other benefits, but did not receive the promised benefits in return.

307.     Plaintiffs and Class members have not materially breached the contract, have complied with all obligations under the contract, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

308.     Defendant's conduct was reckless, wanton, malicious, intentional, and with gross disregard for the rights of Plaintiffs and Class members, thereby entitling Plaintiffs and Class members to punitive damages.

309.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been injured and sustained damages.

<u>**COUNT III**</u>
**UNJUST ENRICHMENT**
**(on behalf of Plaintiffs and the Class)**

310.     All preceding paragraphs are incorporated by reference as though fully set forth herein.

311.     The University held itself out as a viable, reliable, stable university which could follow state regulations, remain accredited, and meet the standards of accreditation, including its

ability to remain financially stable, promptly notify students of an impending closure, and provide students with a teach-out plan to continue their education at another university.

312.     Defendant's obligations, including to remain financially stable, promptly notify students of an impending closure, and provide students with a teach-out plan, were intended to benefit Plaintiffs and Class members, Plaintiffs and Class members reasonably relied on Defendant's ability to meet its obligations, and Defendant's obligations were material to Plaintiffs and Class members choice to enroll in the University.

313.     Plaintiffs and Class members paid tuition to Defendant, declined employment and other opportunities, or declined enrollment at other institutions so that they could attend the University and obtain the benefits guaranteed under the contract.

314.     Defendant failed to notify students, staff, its accrediting agency, or government regulators of its financial instability and impending closure.

315.     Defendant failed to create a teach-out plan for enrolled students, despite knowledge of its financial instability and impending closure.

316.     Defendant closed the University with no notice, leaving students with no plan to transfer credits or attend another university.

317.     Defendant's failure to meet its obligations directly injured Plaintiffs and Class members, who have spent considerable time and money seeking a degree from the University but now cannot continue their education at the University or transfer to another university within a reasonable time and for a reasonable cost.

318.     Plaintiffs and Class members paid tuition, turned down other opportunities, and provided Defendant with other benefits, but did not receive the promised benefits in return.

319.     Defendant knowingly and willingly accepted and enjoyed these benefits.

320.    Defendant's retention of these benefits would be inequitable because Defendant obtained benefits to the detriment of Plaintiffs and Class members when Plaintiffs and Class members did not obtain their promised benefits.

321.    Plaintiffs and Class members have not materially breached the contract, have complied with all obligations under the contract, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

322.    Defendant's conduct was reckless, wanton, malicious, intentional, and with gross disregard for the rights of Plaintiffs and Class members, thereby entitling Plaintiffs and Class members to punitive damages.

323.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members are entitled to restitution.

<u>**COUNT IV**</u>
**FRAUD**
**(on behalf of Plaintiffs and the Class)**

324.    All preceding paragraphs are incorporated by reference as though fully set forth herein.

325.    The University held itself out as a viable, reliable, stable university which could follow state regulations, remain accredited, and meet the standards of accreditation, including its ability to remain financially stable, promptly notify students of an impending closure, and provide students with a teach-out plan to continue their education at another university.

326.    Defendant knew that it was financially unstable and that it could not follow state regulations, remain accredited, and meet the standards of accreditation.

327.    Defendant intended that students rely on its misrepresentations and omissions when choosing to enroll in the University.

328.    The facts mispresented, concealed, and omitted by Defendant were material because a reasonable person would have considered them to be important in deciding whether to enroll in the University.

329.    Defendant knew or should have known that the facts mispresented, concealed, and omitted were material to Plaintiffs and Class members.

330.    Defendant had a duty to inform Plaintiffs and Class members that it was financially unstable and that it could not follow state regulations, remain accredited, and meet the standards of accreditation because Defendant had superior knowledge about such circumstances, and Plaintiffs and Class members could not reasonably have been expected to discover such circumstances through reasonable diligence before enrolling in the University.

331.    Plaintiffs and Class members reasonably relied on Defendant's misrepresentations and omissions when choosing to enroll in the University.

332.    Defendant induced Plaintiffs and Class members to enroll in the University with knowledge that it could not follow state regulations, remain accredited, and meet the standards of accreditation.

333.    Defendant failed to notify students, staff, its accrediting agency, or government regulators of its financial instability and impending closure.

334.    Defendant failed to create a teach-out plan for enrolled students, despite knowledge of its financial instability and impending closure.

335.    Defendant closed the University with no notice, leaving students with no plan to transfer credits or attend another university.

336.    Defendant's misrepresentations and omissions directly injured Plaintiffs and Class members, who have spent considerable time and money seeking a degree from the University but

now cannot continue their education at the University or transfer to another university within a reasonable time and for a reasonable cost.

337.    Plaintiffs and Class members paid tuition, turned down other opportunities, and provided Defendant with other benefits, but did not receive the promised benefits in return.

338.    Plaintiffs and Class members would not have enrolled in the University if they knew that it was financially unstable and that it could not follow state regulations, remain accredited, and meet the standards of accreditation, or they would have only paid substantially less in tuition.

339.    Defendant acted in bad faith and with intent to defraud because:

a.    Defendant held itself out as a viable, reliable, stable university which could follow state regulations, remain accredited, and meet the standards of accreditation with gross disregard for Plaintiffs and Class members' rights and wellbeing;

b.    Defendant accepted and enrolled Plaintiffs and Class members with intent to not operated as a viable, reliable, stable university which could follow state regulations, remain accredited, and meet the standards of accreditation; and

c.    Defendant sought to unjustly enrich itself to the detriment of Plaintiffs and Class members.

340.    Defendant's conduct was reckless, wanton, malicious, intentional, and with gross disregard for the rights of Plaintiffs and Class members, thereby entitling Plaintiffs and Class members to punitive damages.

341.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been injured and sustained damages.

**COUNT V**
**VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**73 Pa. Stat. § 201-1, et seq.**
**(on behalf of Plaintiffs and the Class)**

342.    All preceding paragraphs are incorporated by reference as though fully set forth herein.

343.    The University held itself out as a viable, reliable, stable university which could follow state regulations, remain accredited, and meet the standards of accreditation, including its ability to remain financially stable, promptly notify students of an impending closure, and provide students with a teach-out plan to continue their education at another university.

344.    Defendant knew that it was financially unstable and that it could not follow state regulations, remain accredited, and meet the standards of accreditation.

345.    Defendant intended that students rely on its misrepresentations and omissions when choosing to enroll in the University.

346.    The facts mispresented, concealed, and omitted by Defendant were material because a reasonable person would have considered them to be important in deciding whether to enroll in the University.

347.    Defendant knew or should have known that the facts mispresented, concealed, and omitted were material to Plaintiffs and Class members.

348.    Defendant had a duty to inform Plaintiffs and Class members that it was financially unstable and that it could not follow state regulations, remain accredited, and meet the standards of accreditation because Defendant had superior knowledge about such circumstances, and Plaintiffs and Class members could not reasonably have been expected to discover such circumstances through reasonable diligence before enrolling in the University.

349.    Plaintiffs and Class members reasonably relied on Defendant's misrepresentations and omissions when choosing to enroll in the University.

350.    Defendant induced Plaintiffs and Class members to enroll in the University with knowledge that it could not follow state regulations, remain accredited, and meet the standards of accreditation.

351.    Defendant failed to notify students, staff, its accrediting agency, or government regulators of its financial instability and impending closure.

352.    Defendant failed to create a teach-out plan for enrolled students, despite knowledge of its financial instability and impending closure.

353.    Defendant closed the University with no notice, leaving students with no plan to transfer credits or attend another university.

354.    Defendant's misrepresentations and omissions directly injured Plaintiffs and Class members, who have spent considerable time and money seeking a degree from the University but now cannot continue their education at the University or transfer to another university within a reasonable time and for a reasonable cost.

355.    Plaintiffs and Class members paid tuition, turned down other opportunities, and provided Defendant with other benefits, but did not receive the promised benefits in return.

356.    Plaintiffs and Class members would not have enrolled in the University if they knew that it was financially unstable and that it could not follow state regulations, remain accredited, and meet the standards of accreditation, or they would have only paid substantially less in tuition.

357.    Defendant acted in bad faith and with intent to defraud because:

    a.    Defendant held itself out as being a viable, reliable, stable university which could follow state regulations, remain accredited, and meet the standards of accreditation with gross disregard for Plaintiffs and Class members' rights and wellbeing;

b.      Defendant accepted and enrolled Plaintiffs and Class members with intent to not operated as a viable, reliable, stable university which could follow state regulations, remain accredited, and meet the standards of accreditation; and

c.      Defendant sought to unjustly enrich itself to the detriment of Plaintiffs and Class members.

358.    Defendant's conduct constitutes deceptive and unfair trade practices within the meaning of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. § 201-1, *et seq.*

359.    Defendant's conduct was reckless, wanton, malicious, intentional, and with gross disregard for the rights of Plaintiffs and Class members, thereby entitling Plaintiffs and Class members to punitive damages.

360.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been injured and sustained damages.

## PRAYER FOR RELIEF

WHEREFORE, the following relief is requested:

a.      An order certifying this action as a class action.

b.      An award of statutory, compensatory, incidental, consequential, and punitive damages and restitution to the extent permitted by law in an amount to be proven at trial.

c.      An order enjoining Defendant's unlawful conduct.

d.      An award of attorneys' fees, expert witness fees, costs, and Class representative incentive awards as provided by applicable law.

e.      An award of interest as provided by law, including pre-judgment and post-judgment interest.

f.      Such other and further relief as this Court may deem just, equitable, or proper.

## JURY DEMAND

Trial by jury is demanded.


Dated: June 6, 2024                    Respectfully submitted,

                                       */s/ Nicholas J. Elia*

                                       Daniel C. Levin
                                       Nicholas J. Elia
                                       **LEVIN SEDRAN & BERMAN LLP**
                                       510 Walnut Street, Suite 500
                                       Philadelphia, PA 19106
                                       (215) 592-1500

                                       *Attorneys for Plaintiffs*